UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KELLY ROSSI,
on behalf of C.R.,

                                          Plaintiff,

             v.                                              5:10-CV-97
                                                             (TJM/ATB)

COMMISSIONER OF SOCIAL
SECURITY,

                                          Defendant.
_____

JAYA SHURTLIFF, ESQ., for Plaintiff
PETER W. JEWETT, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

### REPORT-RECOMMENDATION

        This matter was referred for report and recommendation by the Honorable

Thomas J. McAvoy, United States District Judge, pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.3(d).[1]  This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

        Plaintiff Kelly Rossi protectively filed an application for Supplemental Security

Income ("SSI") payments on behalf of her son, C.R.,[2] on November 29, 2006,

claiming disability since September 22, 2004.[3]  (Administrative Transcript ("T.") at

_____

        [1] The case was originally referred to U.S. Magistrate Judge Randolf F. Treece (Dkt. No.
3), but was re-assigned to me on November 18, 2010.  (Dkt. No. 13).

        [2] Throughout this Report, the child on whose behalf this action was brought will be
generally referred to as "the claimant" or by his initials  "C.R."  Kelly Rossi, who commenced
this action on behalf of her son, will generally be referred to as "the plaintiff."

        [3] SSI is not payable prior to the month following the month in which the application was
filed.  20 C.F.R. §§ 416.203(b), 416.501.

97-102).  Plaintiff's application was initially denied on May 16, 2007 (T. 79-82), and

she made a timely request for a hearing before an Administrative Law Judge ("ALJ")

on May 29, 2007 (T. 84).  The hearing, at which plaintiff appeared with claimant, was

conducted on August 25, 2008.  (T. 33-67).

     In a decision dated December 17, 2008, the ALJ found that C.R. was not

disabled.  (T. 13-29).  The ALJ's decision became the final decision of the

Commissioner when the Appeals Council denied plaintiff's request for review on

December 4, 2009.  (T. 8-10).

## II.    ISSUES IN CONTENTION

     The plaintiff makes the following arguments:

1.    The ALJ failed to meet his duty to develop the record with regard to Autism Spectrum Disorder.

2.    The ALJ did not apply the appropriate legal standards in assessing plaintiff's credibility and his credibility finding was not supported by substantial evidence.

3.    The ALJ erred when he found C.R.'s impairments were not functionally equivalent to a listed impairment.

(Pltf.'s Brief at 1, Dkt. No. 10).

     This court concludes that ALJ did not err by failing to develop the record

regarding Autism Spectrum Disorder, given the paucity of evidence indicating that

plaintiff suffered from that condition.  However, the ALJ's findings that the claimant

had a less than marked impairment in the domains of acquiring/using information and

interacting/relating with others, and hence his conclusion that claimant was not disabled, were not supported by substantial evidence.  I recommend that the case be remanded for the ALJ to re-assess the evidence with respect to those domains, and to reevaluate whether the claimant's conditions were functionally equivalent to a listed impairment.  Finally, although the ALJ stated the appropriate legal standard with respect to the credibility of plaintiff's statements about her son's condition, I recommend that, on remand, the ALJ more clearly explain his credibility findings.

## III.   FACTS

The court will only briefly summarize the medical, educational, and other evidence, which is set forth at length in plaintiff's brief (at 2-10).  Relevant details of the medical and educational evidence, and the testimony of the plaintiff, are discussed below in the course of analyzing the issues disputed by the parties.

Claimant C.R. is a male child, born in December 2001; he was almost five years old on the application filing date of November 29, 2006 and about six years, eight months old on the hearing date of August 25, 2008.  A treating doctor first noted C.R.'s developmental delays in May 2003 and recommended that his mother seek early intervention services.  (T. 167).  However, C.R.'s parents did not seek further evaluation or remedial services until he was school-aged.  (T. 38-39, 53, 207).

### A.    Medical Evidence

#### 1.    Treating Physicians

C.R.'s first regular pediatrician was Dr. Yung Kim, but he started seeing Dr. Hanna primarily about a year before the administrative hearing in August 2008.  (T. 53-54).  Dr. Kim supervised C.R.'s care when he was hospitalized in February 2007 for acute asthma and respiratory distress.  (T. 213-15).  During this hospitalization, Dr. Kim noted C.R.'s developmental delays and "some symptoms of Autism Spectrum Disorder, possibility of Aspergers Syndrome."  (T. 215).  Otherwise, C.R.'s treating physicians generally addressed only medical issues such as his asthma and related respiratory problems.  (T. 164, 216-220).

#### 2.    Consultative Sources

Following the filing of the SSI application, C.R. was evaluated in January 2007 by a consulting speech and language pathologist, Patricia Munski, who found that the claimant had moderate receptive language delays, mild expressive language delays, and moderate articulation/phonological delay.   (T. 172-75).  In April 2007, C.R. was also tested and assessed by a consulting psychologist, Kristen Barry, Ph. D., who concluded, *inter alia*, that the claimant had borderline cognitive and intellectual functioning.  (T. 176-79).  C.R.'s hearing was formally tested in April 2007 by Dr. Stephen J. Dubin, who found that the claimant had normal hearing thresholds on the left and normal to borderline hearing on the right.  (T. 180-83).

4

In May 2007, a state agency reviewing pediatrician, R. Baum, M.D., completed a Childhood Disability Evaluation Form without examining C.R.  (T. 184-191).  Dr. Baum found that the claimant had a severe learning disorder, resulting in speech and language delays, and borderline cognitive functioning; but he found that these conditions did not medically or functionally equal any impairment listed in the applicable regulations.  (T. 186).  Dr. Baum concluded that C.R. had no limitation in moving about and manipulating objects and less than marked limitations in the other five childhood "domains" that are assessed in determining whether a child's conditions are functionally equivalent to a listed impairment.  (T. 188-189).

**B.   Educational Evidence**

In anticipation of his enrollment in kindergarten, C.R. was tested and assessed in June 2007 by school psychologist, Amy C. Kenner-Marsden, who concluded, *inter alia* that C.R. was functioning in the borderline range of abilities and required comprehensive speech/language and occupational/physical therapy evaluations.  (T. 207-211).  A speech and language evaluation of C.R. in September 2007 by Beverly C. Young, M.S., resulted in a recommendation that he receive speech and language therapy five times per week, to include two one-on-one sessions.  (T. 205-206).  C.R. was assessed by an occupational therapist and a physical therapist in January 2008, who recommended that he have therapy of each type twice per week.  (T. 199-204).  These therapists raised concerns about C.R's sensory processing irregularities, poor

postural stability, delayed visual-motor integration skills, and delayed gross motor skills. (T. 201).

C.R. was placed in a special education setting in kindergarten, in which one teacher and four assistants attended to 12 children. (T. 135). His teacher, Dawn Seymour, prepared a generally positive Progress Report for IEP (individualized education program) Goals for C.R.'s parents in June 2008 (T. 143-147) and, in August 2008, completed a Teacher/School Questionnaire that identified C.R.'s numerous problems in the six "domains" corresponding to those identified in applicable SSI regulations. (T. 135-142).

In May 2008, the Mexico School District prepared an IEP for C.R., which included evaluations from C.R.'s teacher and the speech/language, occupational, and physical therapists who saw him weekly. (T. 148-162). The IEP recommended that C.R. repeat kindergarten and continue a year-round special education setting with a 12:1+1 student:teacher/assistant ratio, with the same weekly schedule for speech/language, occupational, and physical therapy. (T. 157-58, 160).

## C.     The Administrative Hearing

At the administrative hearing held on August 25, 2008, plaintiff testified, and then the ALJ briefly questioned the claimant, C.R. (T. 33-67). The ALJ granted the request of plaintiff's lawyer to keep the record open so that she could submit additional records, including those of C.R.'s former treating pediatrician, Dr. Kim, and

the school psychologist.  (T. 62-67).

## IV.   APPLICABLE LAW

### A.   Disability Standard[4]

An individual under the age of eighteen is disabled, and thus eligible for SSI

benefits, if he or she has a medically determinable physical or mental impairment,

which results in marked and severe functional limitations, and which can be expected

to result in death, or which has lasted or can be expected to last for a continuous

period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(C)(I).  However, that

definitional provision excludes from coverage any "individual under the age of

[eighteen] who engages in substantial gainful activity. . . ."  42 U.S.C. §

1382c(a)(3)(C)(ii).

By regulation, the agency has prescribed a three-step evaluative process to be

employed in determining whether a child can meet the statutory definition of

disability.  20 C.F.R. § 416.924; *Kittles v. Barnhart*, 245 F. Supp. 2d 479, 487-88

(E.D.N.Y.2003); *Ramos v. Barnhart*, 02 Civ.3127, 2003 WL 21032012, at *7

(S.D.N.Y. May 6, 2003).  The first step of the test requires a determination of whether

the child has engaged in substantial gainful activity.  20 C.F.R. § 416.924(b); *Kittles*,

245 F. Supp. 2d at 488.  If so, then by statute and by regulation, the child is ineligible

---

[4] This statement of the relevant disability standard is closely based on the opinion of
Magistrate Judge Bianchini in *Hudson v. Astrue*, 1:06-CV-1342 (LEK/VEB), 2009 WL 1212114,
at *3-4 (N.D.N.Y. Apr. 30, 2009).

for SSI benefits.  42 U.S.C. § 1382c(a)(3)(C)(ii); 20 C.F.R. § 416.924(b).

If the claimant has not engaged in substantial gainful activity, the second step of the test requires examination of whether the child suffers from one or more medically determinable impairments that, either alone or in combination, are properly regarded as "severe," in that they cause more than a minimal functional limitation.  20 C.F.R. § 416.924(c); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7.  If the child if found to have a severe impairment, the Commissioner must then determine, at the third step, whether the impairment meets or equals a presumptively disabling condition identified in the listing of impairments set forth in 20 C.F.R. Pt. 404, Subpt. P., App. 1.  *Id*.  Equivalence to a listing can be either medical or functional.  20 C.F.R. § 416.924(d); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7.  If an impairment is found to meet, or qualify as medically or functionally equivalent to, a listed disability, and the twelve-month durational requirement is satisfied, the claimant will be found to be disabled.  20 C.F.R. § 416.924(d)(1); *Ramos*, 2003 WL 21032012, at *8.

"Functional" equivalence must be examined only if it is determined that the claimant's impairment does not meet or medically equal the criteria for a listed impairment.  Analysis of functionality is informed by considering how a claimant functions in six main areas referred to as "domains."  20 C.F.R. § 416.926a(b)(1); *Ramos*, 2003 WL 21032012, at *8.  The domains are described as "broad areas of

functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1).  Those domains include: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).

Functional equivalence is established by a finding of an "extreme" limitation, meaning "more than marked," in a single domain.  20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8.  An "extreme limitation" is an impairment which "interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3)(I) (emphasis added).

Alternatively, a finding of disability is warranted if a "marked" limitation is found in any two of the listed domains.  20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012, at *8.  A "marked limitation" exists when the impairment "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(I).  "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C).

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)); *Williams*, 859 F.2d at 258.

10

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id.  See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## V.    THE ALJ'S DECISION

In his decision, the ALJ confirmed that the claimant was a preschooler (age three to attainment of age six) on the application date of November 29, 2006, and a school-age child (at least six, younger than twelve) on the date of the administrative decision on December 17, 2008.  The ALJ found that C.R. had not engaged in substantial gainful activity at any time relevant to the administrative decision.  (T. 19). He determined that the claimant suffered from a number of "severe" impairments: borderline intellectual functioning; a learning disability with moderate receptive, expressive, and articulation delays and mild motor delays; and recurrent upper respiratory infections.  (T. 19-20)[5].

The ALJ found that C.R. did not have an impairment or combination of

---

[5] Based on the audiometric testing conducted in April 2007, the ALJ concluded that C.R. did not have a medically determinable hearing loss, although his mother testified at the administrative hearing that her son had hearing difficulties "on and off."  (T. 20; 39).

impairments that met or medically equaled the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1.  The ALJ stated that he considered the impairments listed in sections 102.00 (physical senses and speech), 112.02 (organic mental disorder), and 112.05 (mental retardation).  (T. 20).  In connection with his analysis of possible listed impairments for organic mental disorder and mental retardation, the ALJ found that the claimant did not have marked impairments in his cognitive/communicative function; social functioning; personal functioning; or ability to maintain concentration, persistence, or pace.  (T. 20).[6]

The ALJ also found that the claimant did not have any impairment that functionally equaled the listings.  He found that the claimant had no limitation in any of the six childhood "domains" relevant to the functional equivalence analysis.  (T. 21-28).  Accordingly, the ALJ concluded that C.R. had not been disabled since November 29, 2006, the date the application was protectively filed.  (T. 29).

## VI.   ANALYSIS

The plaintiff argues that the ALJ erred by failing to develop the record with regard to Autism Spectrum Disorder.  The plaintiff also asserts that there was not substantial evidence to support the ALJ's findings that C.R. did not have any

---

[6] In reaching this conclusion, the ALJ incorporated his discussion relating to the functional equivalence analysis of C.R.'s limitations in the six childhood domains.  (T. 20, 21-28).  The domains are not identical to, but do substantially overlap the four areas of functioning that make up part of criteria for the listing for mental disorder or retardation.  *See, e.g., Scullark v. Apfel*, 97 Civ. 7138, 1998 WL 472059, at *6 & n.8 (S.D.N.Y. Aug. 6, 1998).

impairment or combination of impairments that were functionally equivalent to a listed impairment. Finally, plaintiff contends that the ALJ did not apply the appropriate legal standards in performing his credibility assessment, and that there was not substantial evidence supporting the ALJ's findings with respect to the credibility of plaintiff's statements regarding the intensity, persistence, and limiting effects of her son's symptoms. (Pltf.'s Brief at 1, 13-20).

Dr. Kim's one observation that C.R. may have had some symptoms of Autism Spectrum Disorder was not enough to require the ALJ to develop the record with respect to this condition, particularly given that two examining psychologist did not suggest that C.R. suffered from autism. However, the ALJ's finding that the claimant had less than marked impairments in all of the childhood domains was not supported by substantial evidence. I recommend that the case be remanded so that the ALJ can reconsider the evidence with respect to the domains of acquiring/using information and interacting/relating with others, and reevaluate whether the claimant's conditions were functionally equivalent to a listed impairment. The ALJ articulated the appropriate legal standards for assessing the credibility of plaintiff's statements; however, on remand, the ALJ should more clearly explain what testimony of the plaintiff he found less than credible and why.

## A.     The ALJ's Development of the Record

Plaintiff alleges that the ALJ failed to properly develop the record with regard

13

to C.R.'s possible autism.  (Pltf.'s Brief at 13-14).  Given the remedial intent of the

Social Security statute and the non-adversarial nature of benefits proceedings, an ALJ

has an affirmative duty, even if the claimant is represented by counsel, to develop the

medical record, if it is incomplete.  *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999);

20 C.F.R. § 416.912(d) ("We will make every reasonable effort to help you get

medical reports from your own medical sources when you give us permission to

request the reports.").  In furtherance of the duty to develop the record, an ALJ may

re-contact medical sources if the evidence received from the treating physician or

other medical sources is inadequate to determine disability, and additional information

is needed to reach a determination.  20 C.F.R. § 416.912(e).  Given the limited

evidence that suggested that C.R. might be suffering from autism, and the fact that two

psychologists evaluated the claimant, apparently without finding any indication of

autism, the ALJ did not err by declining to further develop the record on this issue.

The suggestion that claimant had some symptoms of autism appears only once

in the voluminous educational and medical records in evidence.  (T. 215). After

treating C.R. in February 2007 for acute respiratory distress, Dr. Young Kim noted:

"Developmental delay, patient showed some symptoms of Autism Spectrum Disorder,

possibility of Asperger's syndrome."  Dr. Kim instructed claimant's mother "to have

further workup done for developmental delay, particular Autism Spectrum Disorder."

(T. 215).  The pediatrician provided no further explanation of what aspects of C.R.'s

medical history and symptoms he associated with autism, as opposed to developmental delays.  In connection with his SSI application and his matriculation in school, C.R.  was thereafter assessed by two different psychologists, neither of whom reported any indication that he suffered from autism.  (T. 176-179, 207-211).

Claimant's counsel has an affirmative duty promptly to bring before the ALJ any medical evidence relevant to claimant's impairments and to the determination of disability.  20 C.F.R. § 416.1540(b)(1).  The ALJ granted plaintiff's request, at the end of the administrative hearing, to keep the record open, *inter alia*, for records from Dr. Kim.  (T. 63-64); but the records counsel submitted made only the brief reference to autism quoted above.  Counsel never previously objected to the state of the record regarding the possibility that C.R. had autism or requested that the ALJ supplement the record with respect to that issue.  (T. 63-66).

The ALJ had numerous medical and educational reports which addressed C.R.'s developmental delays, and did not need a formal assessment with respect to possible autism to evaluate claimant's limitations in the six domains of childhood functioning. Given the paucity of evidence suggesting that plaintiff suffered from autism, the ALJ did not err in failing to further develop the record with respect to that disorder.  *See Aldrich v. Astrue*, 5:08-CV-402, 2009 WL 3165726, at *7 (N.D.N.Y. Sept. 28, 2009) (a treating physician is recontacted only in situations where the evidence from treating or other medical sources is insufficient for the ALJ to determine whether a claimant is

disabled); *Rosa v. Callahan*, 168 F.3d 72, 79, n.5 (2d Cir. 1999) ("where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim"). *See also Tirado v. Bowen*, 842 F.2d 595, 596 (2d Cir. 1988) (noting that, ordinarily, claimants should have one opportunity to prove entitlement, otherwise proceedings would be an unending merry-go-round).

## B.    Functional Domains

As discussed above, if the claimant's condition does not meet or medically equal a specifically listed impairment, the ALJ must determine whether claimant has an impairment or combination of impairments that functionally equals a listing.  The functional equivalence determination is based upon an analysis of six domains:  (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).  The ALJ concluded that C.R. had less than marked limitations in all six childhood domains.  (T. 21-28).  Plaintiff argues[7] that the ALJ erred because the substantial evidence showed

---

[7] Plaintiff argued first that the ALJ's failure to develop the record with respect to Autism Spectrum Disorder necessarily impacted his ability to make a complete and accurate assessment of C.R.'s limitations.  (Pltf.'s Brief at 16).  Having concluded above that the ALJ did not err by not further developing the record, plaintiff's alternative argument about the lack of evidentiary support for the ALJ's findings with respect to three domains is considered here.

16

marked limitations, at least in the domains of acquiring and using information; attending and completing tasks; and interacting and relating with others.  (Pltf.'s Brief at 16).[8]  This court agrees that the ALJ's findings that plaintiff's limitations were less than marked in the domains of acquiring and using information and interacting and relating with others were not supported by substantial evidence and recommends a remand to re-address the evidence relating to those domains.

### 1.    Acquiring and Using Information

In assessing the domain relating to acquiring and using information, the ALJ must consider how well a child acquires or learns information, and how well he can use the information he has learned.  20 C.F.R. § 416.926a(g).  For a pre-school child (age three to attainment of age six), the ability to acquire and use information should manifest itself in the following abilities: listening to stories, rhyming words, matching letters, counting, sorting and copying shapes, building with blocks, painting, coloring, using scissors, using words to ask questions, giving answers, following directions, describing things, explaining oneself, and telling stories.  20 C.F.R. § 416.926a(g)(2)(iii).

A school-age child (*i.e.* at least six, younger than twelve) should be able to read, write, perform math, and discuss history and science.  The child should be able to

---

[8] Plaintiff did not specifically contend that the ALJ erred in his findings of less than marked impairments in the domains of moving about and manipulating objects; caring for oneself; and health and physical well-being.  (Pltf.'s Brief at 16-20).  The ALJ's Decision recites substantial evidence supporting his findings with respect to those domains.  (T. 26-28).

demonstrate these skills both in academic situations and in daily living.  20 C.F.R. §

416.926a(g)(2)(iv).  The applicable regulations provide examples of circumstances in

which a child might have limited functioning with respect to this domain:  if he or she

does not demonstrate understanding of words about space, size, or time; cannot rhyme

words or the sounds in words; has difficulty recalling information learned in school

the previous day; has difficulty solving mathematical problems; and/or talks in short,

simple sentences and has difficulty explaining what he or she means.  20 C.F.R. §

416.926a(g)(3).

The ALJ found that C.R. had less than marked limitations in acquiring and

using information even though C.R. was due to repeat kindergarten in a special

education setting,[9] and had IQ[10] scores in the "borderline range."  The consultative

psychologist, who tested C.R. in April 2007, reported a full-scale IQ of 80, using the

Wechsler Preschool and Primary Scale of Intelligence (3d Ed.) ("WPPSI-III"), and

concluded that he was functioning "in the borderline range of intelligence."  (T. 177,

178; 19, 22).  A school psychologist applied the same test to C.R. in June 2007 and

---

[9] C.R. was placed in a self-contained classroom with 12 students, 1 teacher, and 4 assistants.  (T. 135).  He also received speech/language, occupational, and physical therapy, each several times per week.  (T. 19, 158)

[10]  General Intellectual Functioning is defined by the intelligence quotient ("IQ" or "IQ equivalent") that is obtained by assessment with one or more of the standardized, individually administered intelligence tests.  AMERICAN PSYCHIATRIC ASSN., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4th Ed. Text Revision 2000)(DSM-IV-TR).

reported a full-scale IQ of 70 or 71,[11] with a majority of the sub-test scores at or below 6 (out of 10).  (T. 209).  The average IQ score under WPPSI-III is 100, with a standard deviation of 15; the average score for sub-tests is 10, with a standard deviation of 3.[12] Hence, at least some of the test scores for C.R. were near or below two standard deviations from the mean.  Results of such testing at or below two standard deviations from the mean is one of the criteria for classifying cognitive limitations as marked.  20 C.F.R. § 416.926a(e)(2)(iii).  The school psychologist did state, as the ALJ noted, that the borderline test scores could be an underestimate of his actual abilities because of C.R.'s lack of prior school experience.  (T. 209; 19, 22).[13]

In supporting his finding of a less than marked impairment in this domain, the ALJ noted that C.R.'s teacher noted that he knew most of his letters and sounds, and was making amazing progress in mathematics.  (T. 149; 22).  In June 2008, a teacher's report stated that C.R. showed satisfactory progress in reaching the majority of the

---

[11] The table in the school psychologist's report reflected a full-scale IQ score of 71, but the text reported a score of 70.  (T. 209).  The ALJ's decision stated that the IQ score was 71, without explaining how he reconciled the apparent inconsistency in the report.  (T. 19).

[12] CONCISE ENCYCLOPEDIA OF SPECIAL EDUCATION, C. Reynolds & E. Fletcher-Janzen, 2d Ed. (2002), at 999-1000.

[13] In assessing C.R.'s limitations in this domain, the ALJ also cited the observation of the consulting speech pathologist that the claimant could follow and understand simple directions and instructions.  (T. 174; 22).  The ALJ further noted the remark of the consultative psychologist that C.R. recalled and understood instructions.  (T. 177; 22).  These observations were not particularly probative to the issue of claimant's ability to acquire and use information, compared to the primary conclusions of the consultants–that C.R. had moderate receptive language delays and mild expressive language delay (T. 175) and general cognitive functioning in the borderline range (T. 178).

goals in his IEP; however, none of C.R.'s goals were "achieved." (T. 144-47; 22). The ALJ selectively accentuated the positive aspects of C.R.'s educational records regarding his ability to acquire and use information. The ALJ did not note that, despite some of her encouraging remarks, C.R.'s teacher reported that he was at a pre-kindergarten instructional level for all subjects. (T. 135). The ALJ stated that C.R.'s teacher reported only one "very serious" problem in only one (of ten) activities within this domain–expressing ideas in written form. (T. 136; 22). However, C.R.'s teacher noted that he had at least "obvious" problems in all of the ten "activities" within this domain and "serious" problems in five of these areas–reading and comprehending written material; providing organized oral explanations and adequate descriptions; learning new material; recalling and applying previously learned material; and applying problem-solving skills in class discussions. (T. 136). A "very serious problem" coincides with the regulatory definition of an extreme limitation and "serious" problems correspond with "marked" limitations. 20 C.F.R. § 416.926a(e). While the state agency reviewing physician found, in May 2007, that C.R. had less than marked limitations in this domain (T. 188), this doctor did not have the benefit of the school psychologist's testing of C.R. (T. 207-211), or his teacher's year-end questionnaire (T. 135-42).

The ALJ relied upon C.R.'s ability, at the hearing, to count to 10 and recite the alphabet, purportedly only with one error. (T. 22-23). However, the transcript of the

hearing indicates that the claimant omitted six letters of the alphabet, could not

identify the day of his birthday, and, before he was corrected by the ALJ, mis-

identified the number "17" as "14."  (T. 58-61).  The ALJ's personal observations are

not entitled to substantial deference given his brief interaction with the claimant, the

apparent inaccuracy of at least one of his assessments of claimant's abilities, and his

failure to explain why he credited his observations over, for example, the inconsistent

findings of C.R.'s primary teacher.  *See, e.g., Cavanaugh v. Astrue*, 1:08-CV-637

(LEK/VEB), 2009 WL 4264370, at *8 (N.D.N.Y. Nov. 20, 2009) (the ALJ's

determination regarding the acquiring/using information domain "is entitled to less

deference where . . . the ALJ substituted his own judgment for that of Claimant's

treating providers without providing an adequate explanation for crediting his own,

brief observations and his personal lay opinions over the assessments of professionals

who have interacted with the Claimant . . . over an extended period.").

As noted, C.R.'s teacher concluded that he had "serious" or "very serious"

problems in the majority of activities making up this domain.  The ALJ failed to

reconcile the teacher's findings with other, more positive evidence in the educational

records, upon which the ALJ selectively relied.  Given C.R.'s admittedly "borderline"

intellectual and cognitive functioning, this court finds that the ALJ's conclusion that

the claimant had a less than marked limitation in the acquiring/using information

domain is not supported by substantial evidence.  *See, e.g., Dabul-Montini v. Astrue,*

09-CV-966 (TJM/VEB), 2010 WL 3584348, at *4-9 (N.D.N.Y. July 30, 2010) (there was not substantial evidence supporting the ALJ's finding of a less than marked limitation in acquiring and using information where claimant had a "borderline" IQ–even though it was not so low to meet the clinical definition of mental retardation–and where the ALJ selectively relied on supportive assessments, failing to give appropriate consideration, *e.g.*, to teacher questionnaires indicating serious and very serious problems in many of the activities in the domain); *Martinbeault v. Astrue*, 1:07-CV-1297 (DNH/VEB), 2009 WL 5030789, at *7-8 (N.D.N.Y. Dec. 14, 2009) (teacher's observations that claimant had serious or very serious in many of the sub-activities of the domain did not support the ALJ's ultimate conclusion that claimant had a less than marked limitation in acquiring and using information, given the ALJ's inappropriately selective reliance on parts of the teacher's report ).  This court recommends that the case be remanded so that the ALJ can properly assess the evidence relating to this domain, and appropriately explain how he reconciled conflicting information.  The ALJ should consider obtaining further testimony or other evidence with respect to the testing of claimant's intellectual and cognitive abilities, given the variations in the results reported in the current record and the uncertainty regarding the accuracy of the scores.

### 2.    Attending and Completing Tasks

In this domain, the Commissioner considers the child's ability "to focus and

maintain . . . attention," and how well he can "begin, carry through, and finish . . . activities, including the pace at which [he] perform[s] activities and the ease with which [he] change[s] them." 20 C.F.R. § 416.926a(h).  The regulations provide that a preschooler without an impairment is expected to pay attention when spoken to directly; sustain attention to play and learning activities and concentrate on activities like putting puzzles together or completing art projects; and focus long enough to do many more things independently, such as getting clothes together and dressing, feeding, or putting away toys.  A preschooler should usually be able to wait his or her turn and to change activity when a caregiver or teacher says it is time to do something else. 20 C.F.R. § 416.926a (h)(2)(iii).

With regard to this domain, a school-age child is expected to focus attention in a variety of situations in order to follow directions, remember and organize school materials, and complete classroom and homework assignments.  The child should be able to concentrate on details and not make careless mistakes in work, beyond what would be expected in other children of like age who do not have impairments.  The child should be able to change activities or routines without distracting himself/herself or others, and stay on task and in place when appropriate.  The child should be able to sustain attention well enough to participate in group sports, read independently, and complete family chores.  The child should also be able to complete a transition task–
*e.g.*, to be ready for the school bus, change clothes after gym, change classrooms–

without extra reminders and accommodation.  20 C.F.R. § 416.926a (h)(2)(iv).

The applicable regulations provide examples of limited functioning with respect to attending and completing tasks, including when a child (i) is easily startled, distracted, or over-reactive to sounds, sights, movements, or touch; (ii) is slow to focus on, or fails to complete, activities of interest–*e.g.*, games or art projects; (iii) repeatedly becomes side-tracked from activities or frequently interrupts others; (iv) is easily frustrated and gives up on tasks, including ones he is capable of completing; or (v) requires extra supervision to remain engaged in an activity.  20 C.F.R. § 416.926a(h)(3).

The ALJ noted that the record revealed that C.R. had some problems attending and completing tasks,[14] but concluded that they did not rise to the level of marked limitation.  (T. 23-24).  In support of this finding, the ALJ noted that, in a consultative examination for speech and language, C.R. demonstrated adequate attention and concentration.  (T. 172; 24).  The speech therapist also observed that C.R. appeared able to follow and understand simple directions and instructions.  (T. 174).  During

---

[14] An evaluation on June 19, 2007 by Mexico Central School District school psychologist Amy C. Kenner-Marsden noted that C.R. experienced ongoing difficulty maintaining attention to the assessment tasks and often left the table to get objects he saw around the room.  (T. 208).  C.R.'s special education kindergarten teacher, Ms. Seymour reported that C.R. had "an obvious problem," on an hourly basis, focusing long enough to finish assigned activities or tasks and refocusing to task when necessary.  (T. 137).  Ms. Seymour also stated that C.R. had an obvious problem carrying out multi-step instructions; completing work accurately without careless mistakes; and working at a reasonable pace/finishing on time.  (T. 137).  During the hearing, C.R.'s mother testified that he could not carry out multi-step instructions without repeated reminders, because of issues with his attention span.  (T. 42).

intelligence testing, in April 2007, the consultative psychologist, Dr. Barry, observed that C.R. was able to work in a deliberate, orderly fashion. (T. 177; 24).  Dr. Barry also noted that C.R. was able to understand and recall instructions, and could attend to tasks with structure and some redirection.  (T. 177, 178).  However, she also opined that he may, at times have difficulty in following and understanding age appropriate instructions and completing age appropriate tasks.  (T. 178).  The state agency reviewing pediatrician, based on the reports of the consulting examiners, found that C.R. had less than marked limitations in this domain.  (T. 188).

The ALJ also noted that a treating physician at Oswego Hospital observed, in February 2007 that C.R., although somewhat hyperactive, could easily be redirected. (T. 214; 24).  A January 2008 occupational/physical therapy evaluation noted that C.R. tried hard to please and complete all tasks.  (T. 199; 24).  C.R.'s IEP further noted that he responded well to redirection.  (T. 151; 24).  C.R.'s teacher reported that he had become more independent, and even at times helped other students complete their tasks.  (T. 149).  In her year-end Teacher Questionnaire, Ms. Seymour reported no "serious" or "very serious" problems in the sub-areas for attending to and completing tasks, although she did find that C.R. had "obvious problems" in several areas, as noted above.  (T. 137; 24).

The ALJ must set forth the essential considerations upon which the decision was based with sufficient specificity so as to enable the reviewing court to determine

whether the disability determination was supported by substantial evidence.  However, an ALJ is not required to explicitly set forth and analyze every piece of conflicting evidence in the record.  *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony).

The ALJ could have more clearly explained how he reconciled the seemingly mixed evidence regarding the extent of claimant's limitations in this domain. However, he properly considered the relevant medical and educational evidence and marshaled substantial evidence supporting his conclusion that C.R. limitations were less than marked with respect to the domain of attending and completing tasks.  *See, e.g., Torres v. Commissioner of Social Sec.*, 09 CV 0059(RJD), 2010 WL 2674543, at *7 (E.D.N.Y. June 30, 2010) (while the record indicates the child claimant had some difficulty following instructions and dealing with frustration, educational records indicated these issues could be addressed through constant reinforcement and guidance, and were less than marked); *Gomes v. Astrue*, 633 F. Supp. 2d 171, 185-86 (S.D.N.Y. 2009) (affirming finding that claimant diagnosed with ADHD and speech/language delays had less than marked limitations with respect to attending and completing tasks, where, *inter alia*, claimant responded well to re-direction); *Hudson v. Astrue*, 1:06-CV-1342 (LEK/VEB), 2009 WL 1212114, at *8-9 (N.D.N.Y. Apr. 30, 2009) (upholding the ALJ's finding that claimant's limitations in attending and

26

completing tasks were less than marked, despite observations about some "serious" problems in related areas by teachers, because the ALJ's conclusion was supported by substantial evidence, including the opinion of the treating psychiatrist that claimant's attention span was "fine" on the current medication).

### 3.    Interacting and Relating with Others

In this domain, the Commissioner considers the child's ability to "initiate and sustain emotional connections with others, develop and use the language of [his or her] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i).  The regulations provide that a preschooler without an impairment should be able to socialize with children as well as adults; begin to prefer playmates his or her own age and start to develop friendships with children who are his or her age; use words instead of actions to express thoughts and feeling; share, show affection, and offer to help.  The child should be able to relate to care givers with increasing independence, choose friends, and play cooperatively with other children, one-at-a-time or in a group, without continual adult supervision.  The preschooler is expected to initiate and participate in conversations, using increasingly complex vocabulary and grammar, and speaking clearly enough that both familiar and unfamiliar listeners can understand what he or she is saying most of the time.  20 C.F.R. § 416.926a(i)(2)(iii).

A school-age child is expected to develop lasting friendships with children his

or her age, begin to understand how to work in groups to create projects and solve problems, and have an increasing ability to understand another's point of view and to tolerate differences.  A school-age child "should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand."  20 C.F.R. § 416.926a(i)(2)(iv).

The regulations provide examples of limited functioning with respect to this domain.  A child might have limited functioning if he or she does not reach out to be picked up and held by a care giver; has no close friends; avoids or withdraws from people he or she knows, or is overly anxious or fearful of meeting new people or trying new experiences; has difficulty playing games or sports with rules; has difficulty communicating with others or in asking others for assistance; or has difficulty speaking intelligibly or with adequate fluency.  20 C.F.R. § 416.926a (i)(3).

The ALJ found that C.R. had a less than marked limitation in his ability to interact and relate with others.  He concluded that, although C.R. had language delays, there was no evidence of behavior problems.  (T. 25).   The ALJ noted that C.R.'s mother advised the consultative examining psychologist that C.R. got along fairly well with others, and had good family relationships.  (T. 178; 25).  At the administrative hearing, plaintiff suggested that C.R. has some problems getting along with other children and authority figures; however, she acknowledged that C.R. had friends and enjoyed a very good relationship with his teacher.  (T. 43-44).  The ALJ noted that the

consulting psychologist observed that C.R. was able to interact fairly well with others. (T. 178; 25).  He reported that behavioral testing by a school psychologist in June 2007 revealed that C.R. was in the average range in social skills.  (T. 208; 25). However, the ALJ did not mention that the overall results of tests relating to C.R.'s adaptive behavior reflected an "Extremely Low range of functioning."  (T. 208, 210). C.R.'s IEP noted that he was friendly, enjoyed being with his peers, and did not have behavior problems.  (T. 150-51; 25).

The regulations cite difficulty speaking intelligibly or with adequate fluency as an example of a circumstance in which a child may have a "marked" limitation in the interacting/relating with others domain.  20 C.F.R. § 416.926a(i)(3)(vi).  The ALJ noted that the consulting speech pathologist informally assessed that 80-85% of C.R.'s speech was intelligible, which the ALJ noted was consistent with his observations of C.R. at the hearing.  (T. 25, 174, 188).  The consultative speech and language pathologist assessed that C.R. could adequately express his wants and needs.  (T. 174; 25).  His vocal quality and fluency skills were within normal limits.  (T. 174). However, the speech pathologist also concluded that C.R.'s ability to be understood by others is impacted by frequent articulation errors, which the ALJ did not mention. (T. 173-174; 25).

The only observation that the ALJ made with respect to the September 2007 speech and language evaluation performed after a referral from the Mexico Central

School District was that the claimant was found to be "happy and friendly." (T. 25; 205).  However, this evaluation also reported that the Goldman Fristoe Test of Articulation was administered to C.R., resulting in a score placing him in less than the first percentile, at an age-equivalency of less than 2 years, though his chronological was then age 5 years, 9 months.  (T. 205).  The Test of Language Development–Primary was attempted, but had to be discontinued due to C.R.'s inability to respond to the stimuli.  (T. 205).  The Preschool Language Scale was then administered, yielding a Total Language Score placing C.R. in the 6th percentile, with an age equivalency of 4 years, 8 months.  (T. 205).

In discussing the interacting/relating with others domain, the ALJ did not mention the comments in C.R.'s May 2008 individual education plan about relevant speech and language limitations.  C.R.'s IEP observed that his oral structure, including an extremely high palate, impacted his speech intelligibility.  (T. 150).  The IEP described C.R.'s articulation as characterized by substitutions, distortions and omissions, which also impeded his intelligibility.  (T. 149).  The IEP noted that socially, C.R. was friendly and talkative, but had limited awareness of social rules and nuances (T. 150); it concluded that C.R. would benefit from work on the conversational strategies of attending, turn-taking, topic appropriateness, topic maintenance, and questioning skills.  (T. 150).  His language shows delays both receptively and expressively, especially in the areas of vocabulary, classification,

attributes, grammar, questions and memory.  (T. 149).  C.R. often exhibited a

significantly loud vocal volume and, at times, misunderstands spoken words or speech

sounds.  (T. 150).  The IEP recommended that C.R. be placed in speech therapy five

times per week–three times in 1:1 service and two times in 3:1 service.  (T. 158, 160).

Although C.R.'s teacher found "obvious" problems in some tasks within this

domain rather than  "serious" or "very serious" problems, the list sub-criteria do not

focus on the intelligibility or fluency of the child's speech.  In any event, when she

completed her teacher questionnaire, Ms. Seymour had interacted closely with the

claimant for a year in a classroom with 12 students, and, therefore, was more likely to

be able to understand his speech patterns.  (T. 138).  Moreover, the ALJ did not

account for the highly structured nature of C.R.'s classroom environment in weighing

the educational evidence with respect to his ability to interact and relate to others.

*See, e.g.,Smith v. Massanari*, 00-CV-0402C, 2002 WL 34242375, at *6 (W.D.N.Y.

Mar. 17, 2002) (" [T]he Commissioner's regulations require the ALJ to consider the

effects of a structured or highly supportive setting . . . on the claimant's functioning

and, if the claimant's symptoms or signs are controlled or reduced by the structured

environment, the ALJ is required to consider the claimant's functioning outside of the

highly structured setting."); *Hudson v. Astrue*, 2009 WL 1212114, at *10-11; 20

C.F.R. § 416.924a(b)(5)(iv).

The ALJ's decision cited the May 2007 state agency reviewing physician, who

found that C.R. had less than marked limitations in this domain.  (T. 188).  However, the reviewing physician did not have the benefit of the September 2007 speech and language assessment and C.R.'s IEP, which the ALJ referenced only selectively.

This court concludes that substantial evidence did not support the ALJ's finding that C.R. had a less than marked limitation in interacting and relating with other.  The ALJ selectively relied on findings from several sources that supported his conclusion, while ignoring other credible evidence from the same sources indicating that C.R. had substantial problems in this domain, *e.g.*, speaking intelligibly and being understood by others.  *See, e.g., Cavanaugh v. Astrue*, 2009 WL 4264370, at *11 (the ALJ's failure to address credible evidence relating to claimant's ability to relate to others through speech undermined his conclusion that claimant had a less than marked limitation in interacting and relating with others) (citing *Shaw v. Chater*, 221 F.3d 126, 135 (2d Cir. 2000) (selective and inconsistent reliance on the findings of a medical source undermines the ALJ's analysis)).  The ALJ failed to explain if or how he reconciled considerable reliable evidence that conflicted with his conclusion that claimant suffered from a less than marked limitation in this domain.  "While the ALJ is not required to reconcile every shred of evidence, the ALJ must acknowledge relevant evidence and explain his rejection of such evidence."  *Walker ex rel. J.B. v. Astrue*, 1:06-CV-1180 (NAM), 2010 WL 2287566, at *15 (N.D.N.Y. June 3, 2010) ("The ALJ did not explain why he rejected significant evidence in the record which

32

resulted in an improper evaluation and a flawed analysis of claimant's impairment in [the interacting and relating with others] domain.").  This court recommends that the case be remanded to allow the ALJ to address the conflicting evidence regarding claimant's ability to interact with and relate to others by communicating intelligibly, with adequate fluency.

### C.    The ALJ's Assessment of Plaintiff's Claims of Subjective Symptoms

Plaintiff argues that the ALJ's assessment of her credibility is not supported by substantial evidence, and that he did not apply the appropriate legal standards.  "An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'"  *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record.  *See* 20 C.F.R. § 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce

the pain or other symptoms alleged . . . ."  20 C.F.R. § 416.929(a).  Second, if the

medical evidence alone establishes the existence of such impairments, then the ALJ

need only evaluate the intensity, persistence, and limiting effects of a claimant's

symptoms to determine the extent to which it limits the claimant's capacity to

function.  20 C.F.R. § 416.929(c).  When the objective evidence alone does not

substantiate the intensity, persistence, or limiting effects of the claimant's symptoms,

the ALJ must assess the credibility of the statements regarding claimant's condition by

considering the record in light of the following symptom-related factors: (1)

claimant's daily activities; (2) location, duration, frequency, and intensity of

claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage,

effectiveness, and side effects of any medication taken to relieve symptoms; (5) other

treatment received to relieve symptoms; (6) any measures taken by the claimant to

relieve symptoms; and (7) any other factors concerning claimant's functional

limitations and restrictions due to symptoms.  20 C.F.R. § 416.929(c)(3).

The ALJ summarized some of the plaintiff's claims regarding her son's

subjective symptoms and limitations.  (T. 20, 21, 22, 25, 28).  After considering the

medical evidence, the ALJ concluded that plaintiff's medically determinable physical

impairments could reasonably be expect to cause the alleged symptoms.  (T. 21).

However, the ALJ found that the mother's statements concerning the intensity,

persistence, and limiting effects of the claimant's symptoms were not credible to the

extent they were inconsistent with the ALJ's functional equivalence findings. "There appeared to be some exaggerating in the mother's reports. Her allegations were not supported by the claimant's demonstrated abilities, his performance during testing and evaluations, his teacher's reports, or the opinions of record." (T. 21).

In supporting his credibility determination, the ALJ noted that the plaintiff "stated that the claimant could not say his ABC's, could only sometimes count to 10, and did not know his age [(T. 42-43)]. However, at the August 25, 2008 hearing, the claimant said his ABC's with only one mistake, counted to 10, and stated his age." (T. 21). In fact, the plaintiff testified at the hearing that C.R. did know how old he was. (T. 43). And, as noted above, when the claimant recited his ABC's at the hearing, he apparently missed six letters, rather than one. (T. 60).

The ALJ was also somewhat selective in referencing the mother's testimony. For example, he highlighted the positive statements that the plaintiff made about her son's interaction with others (T. 25), but did not mention or address her comments about her son's conflicts with other children and his periodic failures to follow instructions of authority figures. (T. 43-44). The ALJ's credibility analysis was otherwise rather thin. For example, he mentioned, but did not otherwise address plaintiff's comments about her son's limitations in various aspects of daily activity and self-care. (T. 21, 28).

The ALJ was not obligated to accept plaintiff's testimony about her son's

35

subjective symptoms and restrictions without question, and has the discretion to evaluate credibility in light of the evidence in the record. *See, e.g., Aponte v. Secretary, Dep't of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (it is the function of the Commissioner, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of the witnesses, including the claimant). A court must uphold the Commissioner's decision to discount a claimant's complaints of pain and other subjective complaints if the finding is supported by substantial evidence. *Id.*; 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.")

The ALJ properly articulated the legal standards that applied to his credibility determination. Given that this court is recommending remand for other reasons, I will not decide whether the ALJ's decision adequately marshaled substantial evidence for his credibility finding regarding claimant's mother. On remand, the ALJ should be more specific about what statements of the plaintiff he found not to be credible, and provide more complete explanations for his credibility findings. He should also be mindful of the need to consider the impact of C.R.'s highly-structured school environment to the extent he relies on educational evidence to contradict the testimony of plaintiff about her son's limitations outside of the school setting. *See, e.g., Hudson v. Astrue*, 2009 WL 1212114, at * 6, 10-11 ("[t]he ALJ's decision to afford greater weight to the assessment of Claimant's classroom teachers, rather than her primary

care giver, could be sustained if it were accompanied by consideration of the impact of the structured school setting on the severity of Claimant's limitations); *Smith v. Massanari*, 2002 WL 34242375, at *6.

### D.    Remand

"Sentence four of Section 405(g) provides district courts with the authority to affirm, reverse, or modify a decision of the Commissioner 'with or without remanding the case for a rehearing.'" *Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004) (citing 42 U.S.C. § 405(g)). Remand is "appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, further findings would . . . plainly help to assure the proper disposition of [a] claim." *Kirkland v. Astrue*, 06 CV 4861, 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008).

Given the unresolved inconsistencies between certain of the ALJ's findings and significant aspects of the record evidence, as outlined above, it is recommended that the case be remanded for further proceedings consistent with this Report and Recommendation. Specifically, the ALJ should reconsider and more effectively address and reconcile the conflicting evidence regarding C.R.'s limitations in the domains of acquiring/using information and interacting/relating with others. Moreover, the ALJ should better document his conclusions regarding the credibility of plaintiff's statements about her son's symptoms and limitations, clarifying which statements he found not to be credible and explaining why. In re-assessing whether

37

C.R. has an impairment or combination of impairments that are functionally equivalent to a listing, the ALJ should consider whether he requires more evidence to clarify the inconsistent results of cognitive/intellectual testing of claimant, and should consider the impact of C.R.'s highly structure school setting when weighing evidence from educational reports.

**WHEREFORE,** based on the findings in the above Report, it is hereby

**RECOMMENDED**, that the decision of the Commissioner be reversed, and that the case be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this Report and Recommendation.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**Dated:  December 2, 2010**

Hon. Andrew T. Baxter
U.S. Magistrate Judge